## LAWRENCE FISCHER AND ANOTHER v. STEELOCK OF MINNESOTA, INC.

168 N. W. (2d) 10.

May 9, 1969—Nos. 41272, 41273.

*Thuet, Todd, Anderson & Collins* and *Robert F. Collins,* for appellant.
*Korstad, Pokorny, Brophey & Lucas* and *Wayne A. Pokorny,* for respondents.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

These are appeals by defendant from an order of the district court denying its motions for judgment notwithstanding the verdict or a new trial following jury verdicts for plaintiffs.

There is a good deal of disagreement between the parties over the facts of the cases. It appears undisputed that in 1964 plaintiffs, Lawrence Fischer and Arnold M. Rustad, were employed by Steelock Building Company, which sold and erected steel buildings under a franchise agreement with Armco Steel Corporation. Both plaintiffs worked in the sales end of the business. Steelock Building Company apparently ran into difficulty and in April 1964 one Dell Dahn acquired the Armco franchise for a newly formed corporation, defendant, Steelock of Minnesota, Inc., which he owned and ran. There is some disagreement as to the manner and date of plaintiffs' hiring by the new corporation, but when the corporation began operations in June 1964 they were on the payroll.

Plaintiffs contend that at the time they were hired Dahn offered each of them $160 per week, plus a car and expenses, and a pension-profit-sharing plan to be worked out within a month. Dahn agreed with plaintiffs as to the wages and cars, and these were in fact provided throughout the period of their employment. He claims however, that, although he indicated a profit-sharing plan was a possibility at a future time, no specific date was discussed. Dahn also indicated, contrary to plaintiffs' testimony, that it was plaintiffs who brought up the subject of profit sharing.

It appears that the profit-sharing plan was mentioned several times during conversations between plaintiffs and Dahn and that Dahn indicated that something would be worked out. However, by April 1965 no plan had been proffered. Plaintiffs claim that prior to April 12, 1965, Dahn told

each of them at separate times that he would raise their pay to $200 per week until the profit-sharing plan was arranged. Each plaintiff testified that he was alone with Dahn at the time the offer was made. Dahn denied any such conversations.

The crucial date relative to plaintiffs' claims is April 12, 1965. They contend that on that date at a meeting in Dahn's office attended by plaintiffs, Dahn, and Arthur Qvamme, a sales engineer for Armco who handled the franchises in this area, Dahn offered each of them $200 per week until the profit-sharing plan was worked out and that each of them accepted the offer. Plaintiff Rustad testified that in the course of the meeting the subject of salaries came up and Dahn said, "Will you accept $200 a week in lieu of a contract at this time until such time as this contract could be worked out on the basis of previous discussion?" Rustad said that he replied that he would accept it. Plaintiff Fischer testified that at the April 12 meeting he and Rustad indicated what they thought they should receive in a profit-sharing plan and that Dahn said that he couldn't work out the plan at that time but would do so and he would pay each plaintiff up to $200 a week until the plan was worked out. Fischer testified that he accepted this offer. In his pretrial deposition, when requested to paraphrase Dahn's statement, Fischer had stated that Dahn said he would "work on" an increase to $200 a week.

Qvamme was called as a witness by plaintiffs. He testified that he had called the April 12 meeting to discuss organizational matters and that he, Dahn, and the plaintiffs were all present. He stated that in March Dahn had told him he was going to raise plaintiffs' salaries to $200 a week. As to the meeting itself, he was sure that salaries were discussed. When asked what the discussions involved, he stated:

"I remember one specific thing: Mr. Rustad standing up and saying, 'if he couldn't earn from $12,000 to $15,000 a year, he was going to quit,' and this evolved around salary discussions."

He did not testify to any specific mention of $200 a week at the meeting, but did state that after the meeting he talked to plaintiffs about the additional $40 a week and was informed by them that they were not receiving it.

Dahn testified that he had never made any offer of $200 per week. He did not specifically recall the April 12 meeting, although he said it was very possible there was a meeting on that date because he, plaintiffs, and Qvamme had met one or two times. However, he testified that there was never a meeting involving the four of them at which wages were discussed. He indicated that plaintiffs had never spoken to him of $200 a week but had discussed their wage goals in terms of yearly compensation. He further testified that in May 1965 he authorized his attorney, Francis L. Bartholet, to negotiate with plaintiffs to set up a profit-sharing plan.

Mr. Bartholet testified that he had met with plaintiffs on behalf of Dahn four times during May and June 1965. He stated that at the first meeting, on May 5, he had asked what their present salaries were and they had each indicated $160 a week. The only mention made to him of $200 a week was in the form of a demand or request—something that plaintiffs wished to receive along with cars, expenses, and a share of the profits.

It is undisputed that the $200 a week allegedly agreed upon at the April 12 meeting was never paid. Plaintiffs continued to receive $160 a week until they were fired in October 1965, some 26 weeks after the alleged contract was made. They made no demands of Dahn, or even inquiries concerning their raises, during the entire 26-week period. Fischer stated he did ask defendant's bookkeeper about it once, but Dahn testified that he had checked with the bookkeeper and the latter recalled no such inquiry. The only reason given by plaintiffs for their failure to make any inquiries was that, when the raise did not appear on their checks after 4 or 5 weeks, they assumed it was to be included in the bonus-profit-sharing plan which defendant's attorney was supposed to be preparing.

In August or September 1965 the Armco franchise with defendant was cancelled on the recommendation of Qvamme. When plaintiffs learned of this, they decided that they could get their money only by taking legal action. They made no demand of Dahn prior to commencing these suits. The jury returned a verdict of $1,165 in favor of each of the plaintiffs, and the trial court denied defendant's motions for judgment notwithstanding the verdict or a new trial. It is from the order denying those motions that defendant appeals.

Defendant challenges the sufficiency of the evidence to sustain the ver-

dicts. Having reviewed the record we conclude that this challenge must be sustained. In reaching this conclusion we have considered the great weight to be accorded a jury verdict and the limits our well-established rules place on the scope of review in dealing with evidentiary questions. See, 1B Dunnell, Dig. (3 ed.) § 415, and cases cited therein. However, the evidence here so preponderates against the existence of a contract that the trial court must be reversed.

Both plaintiffs testified that Qvamme was present when the alleged offer was made on April 12 and, in fact, Rustad stated that they were relying on the statements Dahn made at the April 12 meeting because they had no witnesses to prior offers. However, when Qvamme was called to testify he said nothing of an offer of $200 a week. The only mention of compensation at the meeting that he could recall was a threat by Rustad to quit if he could not make $12,000 to $15,000 a year. Either of these amounts is more than $200 a week would produce. Thus, the testimony of Qvamme, the only independent witness, does not support the allegation of each plaintiff that an offer of $200 a week was made and accepted at the April 12 meeting.

Despite this lack of outside support for plaintiffs' allegation, they might still have sustained their burden of proof by demonstrating a course of conduct by the parties following the April 12 meeting which would support their claim. See, Hobe Lbr. Co. v. McGrath, 102 Minn. 66, 112 N. W. 1053. However, the only evidence in the record tends to support exactly the opposite conclusion. First, plaintiffs continued to work for some 26 weeks without ever mentioning to either Dahn or Bartholet their alleged contractual right to $200 a week. In fact, the uncontradicted testimony of Bartholet is that plaintiffs told him in May that their salaries were $160 a week. If, as plaintiffs testified, Dahn was difficult to reach and tended to be evasive on the question of compensation, it is clear that plaintiffs did speak with Bartholet on several occasions and that their meetings were intended to and did deal specifically with that question. It is, to say the least, difficult to understand why an employee who believed he had a valid contract for a salary of $200 a week would continue to accept a lesser amount each week for 26 weeks without at least mentioning the discrepancy to his employer. It is even more diffi-

cult to understand why he would not mention it to the attorney designated by the employer to handle the question of employee compensation, particularly when the amount of the employee's weekly wages was specifically discussed.

Second, the only explanation offered by plaintiffs for their inaction when the claimed raise was not forthcoming was that when it did not appear after 4 or 5 weeks they assumed it would be included in the profit-sharing plan being worked out by Bartholet. Yet both plaintiffs testified that the alleged contract for $200 a week was in effect a stopgap measure until a complete compensation plan could be worked out. In attempting to state the terms of the offer, plaintiff Rustad said that Dahn asked him if he would accept $200 a week "in lieu of a contract at this time until such time as this contract could be worked out." Plaintiff Fischer, both in court and in his deposition, claimed that Dahn spoke of paying $200 a week until the bonus plan could be worked out. Therefore, the explanation for plaintiffs' inaction is inconsistent with their testimony concerning the terms of the offer made to them. The alleged offer on which this suit is based, according to plaintiffs' own testimony, would have entitled each plaintiff to $200 a week until the profit-sharing plan was ready. There is no evidence to support an assumption that payment was to be deferred until the plan went into effect.

The evidence on which a jury could find the existence of a contract is thus reduced to nothing more than assertions by plaintiffs that the offer was made and accepted by them. This was categorically denied by Dahn. Under these circumstances there must be something more to support the existence of the contract. In failing to provide anything more plaintiffs have failed to sustain their burden of proof, and it was error for the court to deny defendant's postverdict motions for judgment notwithstanding the verdict. LaFavor v. American Nat. Ins. Co. 279 Minn. 5, 155 N. W. (2d) 286. See, also, Berryhill v. Carney, 76 Minn. 319, 79 N. W. 170.

Reversed.